# EXHIBIT H

## COVID Emergency Directives

# EXHIBIT H



### DECLARATION OF EMERGENCY
### DIRECTIVE 008

**WHEREAS,** on March 12, 2020, I, Steve Sisolak, Governor of the State of Nevada issued a Declaration of Emergency to facilitate the State's response to the COVID-19 pandemic; and

**WHEREAS,** on March 13, 2020, Donald J. Trump, President of the United States declared a nationwide emergency pursuant to Sec. 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"); and

**WHEREAS,** the World Health Organization (WHO) and United States Centers for Disease Control and Prevention (CDC) have advised that there is a correlation between density of persons gathered and the risk of transmission of COVID-19; and

**WHEREAS,** as of March 29, 2020, the State of Nevada Department of Health and Human Services is reporting 738 positive cases of COVID-19, and 15 deaths resulting from COVID-19; and

**WHEREAS,** close proximity to other persons is currently contraindicated by public health and medical best practices to combat COVID-19; and

**WHEREAS,** NRS 414.060 outlines powers and duties delegated to the Governor during the existence of a state of emergency, including without limitation, directing and controlling the conduct of the general public and the movement and cessation of movement of pedestrians and vehicular traffic during, before and after exercises or an emergency or disaster, public meetings or gatherings; and

**WHEREAS,** NRS 414.070 outlines additional powers delegated to the Governor during the existence of a state of emergency, including without limitation, enforcing all laws and regulations relating to emergency management and assuming direct operational control of any or all forces, including, without limitation, volunteers and auxiliary staff for emergency management in the State; providing for and compelling the evacuation of all or part of the population from any stricken or threatened area or areas within the State and to take such steps as are necessary for the receipt and

care of those persons; and performing and exercising such other functions, powers and duties as are necessary to promote and secure the safety and protection of the civilian population; and

**WHEREAS,** the Nevada Attorney General opined in Opinion Number 57-336 that "[t]here can be no question but that the Legislature intended to give to the Governor the broadest possible powers consistent with constitutional government in a time of dire emergency"; and

**WHEREAS,** I ordered a closure of nonessential businesses and Nevada's public and charter schools that, in addition to adverse economic conditions resulting from the COVID-19 pandemic, is negatively impacting financial stability of a significant number of individuals, families, and businesses statewide, hindering the ability of Nevadans and businesses to make timely mortgage or rent payments; and

**WHEREAS,** stability in housing is essential for all Nevadans to abide by social distancing recommendations that aid in containing the spread of COVID-19; and

**WHEREAS,** removal of Nevadans from their homes by foreclosure or eviction increases vulnerability to transmission of COVID-19, which in turn increases the general public health risk resulting from spread of COVID-19; and

**WHEREAS,** efforts to treat, prevent, or reduce the spread of COVID-19 may make it medically necessary and reasonable to require individuals to remain in isolation or quarantine at their homes or otherwise remain indoors; and

**WHEREAS,** to avoid serious health, safety, welfare, and financial consequences that may result from the eviction, foreclosure or other removal of Nevadans and businesses from their homes or establishments during this emergency, it is reasonable and necessary to suspend eviction and foreclosure actions or proceedings related to residential and commercial real property in Nevada; and

**WHEREAS,** on March 18, 2020, the President of the United States announced the Department of Housing and Urban Development, in an effort to provide immediate relief to renters and homeowners, will temporarily suspend all foreclosures and evictions, and at least nine other states around the nation having taken similar actions as of March 25, 2020; and

**WHEREAS,** on March 25, 2020, the United States Congress passed an aid-package that is intended to provide substantial economic assistance to businesses, individuals, and families throughout the nation, and a temporary suspension of eviction and foreclosure actions or proceedings will give Nevadans and businesses facing financial hardship resulting from the COVID-19 pandemic a grace period to obtain financial assistance made available through this extensive aid-package, as well as others, while allowing them to maintain essential stability in housing and business establishments; and

**WHEREAS,** Article 5, Section 1 of the Nevada Constitution provides: "The supreme executive power of this State, shall be vested in a Chief Magistrate who shall be Governor of the State of Nevada;"

***NOW THEREFORE,*** by the authority vested in me as Governor by the Constitution and the laws of the State of Nevada and the United States, and pursuant to the March 12, 2020 Emergency Declaration,

IT IS HEREBY ORDERED THAT:

SECTION 1:   No lockout, notice to vacate, notice to pay or quit, eviction, foreclosure action, or other proceeding involving residential or commercial real estate based upon a tenant or mortgagee's default of any contractual obligations imposed by a rental agreement or mortgage may be initiated under any provision of Nevada law effective March 29, 2020, at 11:59 p.m., until the state of emergency under the March 12, 2020 Declaration of Emergency terminates, expires, or this Directive is rescinded by order of the Governor.  This provision does not prohibit the eviction of persons who seriously endanger the public or other residents, engage in criminal activity, or cause significant damage to the property.

SECTION 2:   That an individual has tested positive for COVID-19 or has been potentially exposed to the novel coronavirus that causes COVID-19 does not serve as a basis for establishing that a tenant or resident seriously endangered the safety of others.

SECTION 3:   No provision contained in this Directive shall be construed as relieving any party of their contractual obligations to pay rent, make mortgage payments, or comply with any other obligations imposed on parties by a lease, rental agreement, or mortgage.  Landlords and lenders, however, shall be prohibited from charging any late fees or penalties for any nonpayment under the terms of a lease, rental agreement, or mortgage that occurs between the date of this Directive and the termination or expiration of the March 12, 2020 Declaration of Emergency or the date on which this Directive is rescinded by order of the Governor.

SECTION 4:   No provision contained in this Directive shall be construed to prohibit the continuation of any eviction or foreclosure action or proceeding predating the March 12, 2020 Declaration of Emergency.

SECTION 5:   Eviction of foreclosure actions currently being adjudicated by a court shall be stayed until the state of emergency declared on March 12, 2020 terminates or expires.  This limitation shall not include current eviction or foreclosure proceedings stemming from threats by a tenant or resident to public health or safety, criminal activity, or significant damage to the property.

SECTION 6:   To the extent any agencies providing rental assistance to tenants in Nevada ordinarily require the tenant to provide a seven-day eviction notice issued under NRS 40.253(1) as a prerequisite to obtaining rental assistance, a landlord's or property manager's written notice of nonpayment of rent establishing the delinquency in payment shall be considered as a substitute for the notice of eviction in determining an individual's eligibility for rental assistance while this Directive remains in effect.

SECTION 7:   After the termination or expiration of the March 12, 2020 Declaration of Emergency relating to the COVID-19 pandemic, and abatement of the financial hardships created by the COVID-19 pandemic, borrowers, lenders, tenants, and landlords are encouraged to negotiate payment plans or other agreements within 30 days of the termination of this Directive to allow borrowers and tenants to cure any defaults or missed payments resulting from a financial hardship resulting from the COVID-19 pandemic.

SECTION 8:   This Directive shall remain in effect until the state of emergency declared on March 12, 2020 is terminated or unless renewed by a subsequent Directive promulgated pursuant to the March 12, 2020 Declaration of Emergency to facilitate the State's response to the COVID-19 pandemic.



IN WITNESS WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Nevada to be affixed at the State Capitol in Carson City, this 29th day of March, in the year two thousand twenty.

_____
Governor of the State of Nevada

_____
Secretary of State

_____
Deputy Secretary of State



## DECLARATION OF EMERGENCY

### DIRECTIVE 025

***WHEREAS***, on March 12, 2020, I, Steve Sisolak, Governor of the State of Nevada, issued a Declaration of Emergency to facilitate the State's response to the COVID-19 pandemic; and

***WHEREAS***, on March 13, 2020, Donald J. Trump, President of the United States, declared a nationwide emergency pursuant to Sec. 501(6) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"); and

***WHEREAS***, the World Health Organization (WHO) and United States Centers for Disease Control and Prevention (CDC) have advised that there is a correlation between density of persons gathered and the risk of transmission of COVID-19; and

***WHEREAS***, close proximity to other persons is currently contraindicated by public health and medical best practices to combat COVID-19; and

***WHEREAS***, NRS 414.060 outlines powers and duties delegated to the Governor during the existence of a state of emergency, including without limitation, directing and controlling the conduct of the general public and the movement and cessation of movement of pedestrians and vehicular traffic during, before and after exercises or an emergency or disaster, public meetings or gatherings; and

***WHEREAS***, NRS 414.070 outlines additional powers delegated to the Governor during the existence of a state of emergency, including without limitation, enforcing all laws and regulations relating to emergency management and assuming direct operational control of any or all forces, including, without limitation, volunteers and auxiliary staff for emergency management in the State; providing for and compelling the evacuation of all or part of the population from any stricken or threatened area or areas within the State and to take such steps as are necessary for the receipt and care of those persons; and performing and exercising such other functions, powers and duties as are necessary to promote and secure the safety and protection of the civilian population; and

***WHEREAS***, the Nevada Attorney General opined in Opinion Number 57-336 that "[t]here can be no question but that the Legislature intended to give to the Governor the broadest possible powers consistent with constitutional government in a time of dire emergency"; and

*WHEREAS*, I ordered a closure of nonessential businesses and Nevada's public and charter schools that, in addition to adverse economic conditions resulting from the COVID-19 pandemic, is negatively impacting financial stability of a significant number of individuals, families, and businesses statewide, hindering the ability of Nevadans and businesses to make timely mortgage or rent payments; and

*WHEREAS*, stability in housing is essential for all Nevadans to abide by social distancing recommendations that aid in containing the spread of COVID-19; and

*WHEREAS*, removal of Nevadans from their homes by foreclosure or eviction increases vulnerability to transmission of COVID-19, which in turn increases the general public health risk resulting from spread of COVID-19; and

*WHEREAS*, efforts to treat, prevent, or reduce the spread of COVID-19 may make it medically necessary and reasonable to require individuals to remain in isolation or quarantine at their homes or otherwise remain reasonable to require individuals to remain in isolation or quarantine at their homes or otherwise remain indoors; and

*WHEREAS*, to avoid serious health, safety, welfare, and financial consequences that may result from the eviction, foreclosure or other removal of Nevadans and businesses from their homes or establishments during this emergency, it is reasonable and necessary to suspend eviction and foreclosure actions or proceedings related to residential and commercial real property in Nevada; and

*WHEREAS*, on March 18, 2020, the President of the United States announced the Department of Housing and Urban Development, in an effort to provide immediate relief to renters and homeowners, will temporarily suspend all foreclosures and evictions, and at least nine other states around the nation having taken similar actions as of March 25, 2020; and

*WHEREAS*, on March 25, 2020, the United States Congress passed an aid-package that is intended to provide substantial economic assistance to businesses, individuals, and families throughout the nation, and a temporary suspension of eviction and foreclosure actions or proceedings will give Nevadans and businesses facing financial hardship resulting from the COVID-19 pandemic a grace period to obtain financial assistance made available through this extensive aid-package, as well as others, while allowing them to maintain essential stability in housing and business establishments; and

*WHEREAS*, On March 29, 2020, I entered Directive 008, to ensure the safety of Nevadans and businesses; and

*WHEREAS*, On May 28, 2020, to ensure the safety of Nevadans, I continued lifting the restrictions for an orderly opening of the State through phases; and

*WHEREAS*, many tenants in Nevada have been directly or indirectly impacted by the economic impact of the COVID-19 pandemic, and as a result, those tenants and lenders have been unable to stay current on rental or mortgage payments for their homes and/or businesses; and

*WHEREAS*, many landlords have been directly or indirectly impacted by the economic fallout of the COVID-19 pandemic, and as a result, those landlords have been unable to collect rental or mortgage payments on residential and commercial properties; and

*WHEREAS*, keeping tenants in their homes and ensuring landlords receive payment for delinquent rental amounts are equally important goals; and

*WHEREAS*, tools like the Lease Addendum and Promissory Note for Rental Arrearages Due to COVID-19 ("Lease Addendum/Promissory Note") provide a means for residential landlords and tenants directly or indirectly impacted by the economic impact of COVID-19 pandemic to resolve payment defaults without court action; and

*WHEREAS*, entering into voluntary repayment agreements without legal action will provides a means of satisfaction of debts without overburdening and overwhelming the Nevada judicial system; and

*WHEREAS*, Article 5, Section 1 of the Nevada Constitution provides: "The supreme executive power of this State, shall be vested in a Chief Magistrate who shall be Governor of the State of Nevada;"

*NOW THEREFORE*, by the authority vested in me as Governor by the Constitution and the laws of the State of Nevada and the United States, and pursuant to the March 12, 2020 Emergency Declaration,

IT IS HEREBY ORDERED THAT:

SECTION. 1:   All residential landlords as defined by NRS 118A.100, and tenants are strongly encouraged to use the attached form Lease Addendum/Promissory Note for Rental Arrearages Due to COVID-19, to cure rental payment defaults of the original lease agreement, whether written or oral, as contemplated by Section 7 of Directive 008.  Entering into this Lease Addendum/Promissory Note is voluntary. Negotiated payment amounts should be made in good faith, be reasonable under the totality of the circumstances, and consider the tenant's ability to pay.  For the purposes of this section, the term "residential landlords" shall include property managers.

SECTION 2:   All landlords of manufactured home lots, as defined by NRS 118B.014, and tenants are also strongly encouraged to enter into a voluntary repayment agreement for defaults in rental payments related to COVID-19.  Negotiated payment amounts should be made in good faith, be reasonable under the totality of the circumstances, and consider the tenant's ability to pay.  For the purposes of this section, the term "landlords" shall include property managers.

SECTION 3:   All commercial landlords, as defined by NRS 118C.060, and tenants are also strongly encouraged to enter into a voluntary repayment agreement for defaults in rental payments related to COVID-19.  For the purposes of this section, the term "commercial landlords" shall include property managers.

SECTION 4:   Where landlords and tenants have entered into a repayment agreement as encouraged by Sections 1, 2, or 3 of this Directive, such landlords shall cease any eviction proceeding for nonpayment of rent initiated prior to entering into such repayment agreement and/or dismiss any summary eviction complaint for nonpayment of rent filed prior to entering into such repayment agreement.

SECTION 5:   Section 1 of Directive 008, is hereby amended to authorize limited residential summary eviction actions, as follows:

All summary eviction notices to vacate served prior to March 30, 2020, in which a tenant has not filed an answering affidavit, shall be deemed stale and void.  All summary eviction notices that were served from March 30, 2020 to the effective date of this Directive in violation of Directive 008 shall be deemed void.  To ensure reasonable notice and an opportunity to respond, all stale and/or void notices to vacate must be re-served in accordance with NRS 40.280.

The following summary eviction actions may be initiated or re-initiated with new service, effective July 31, 2020 at 11:59pm.
  (1) Summary eviction actions based on continued possession after the expiration of the lease term, pursuant to NRS 40.250. This is not intended to be used as a subterfuge for a nonpayment of rent basis and courts should be wary of such abuse of this authorization.
  (2) Summary eviction actions for a tenant at will, pursuant to NRS 40.251(1)(a)(3). This is not intended to be used as a subterfuge for a nonpayment of rent basis and courts should be wary of such abuse of this authorization.
  (3) Summary eviction actions based on assignment or subletting contrary to lease; waste; unlawful business; nuisance; and violations of controlled substance laws, pursuant to NRS 40.2514.
  (4) Summary eviction actions based on tenant's failure to perform a lease condition or covenant, pursuant to NRS 40.2516. This is not intended to include failure to pay rental arrearages that have not been resolved by the use of the encouraged Lease Addendum/Promissory Note set forth in Section 1. However, it is intended to include defaults in negotiated payments that have been resolved by the use of the encouraged Lease Addendum/Promissory Note as set forth in Section 1.

SECTION 6:   Section 3 of Directive 008, which prohibits residential landlords from charging any late fees or penalties for any nonpayment under the terms of a lease or rental agreement, will terminate on August 31, 2020 at 11:59pm for prospective late rental payments only. This shall not be retroactively applied to late rental payments from March 30, 2020 to August 31, 2020.

SECTION 7:   Section 5 of Directive 008, which stays residential summary eviction actions currently being adjudicated by a court is hereby amended to allow the court to proceed with a summary eviction hearing under the following timeline. "Actions currently being adjudicated by a court" is intended to include all summary evictions actions in which the tenant has filed an answering affidavit.

The following summary eviction actions currently being adjudicated by a court may proceed, effective July 31, 2020 at 11:59pm:
  (1) Summary eviction actions based on continued possession after the expiration of the lease term, pursuant to NRS 40.250.
  (2) Summary eviction actions for a tenant at will, pursuant to NRS 40.251(1)(a)(3).
  (3) Summary eviction actions based on assignment or subletting contrary to lease; waste; unlawful business; nuisance; and violations of controlled substance laws, pursuant to NRS 40.2514.
  (4) Summary eviction actions based on tenant's failure to perform a lease condition or covenant, pursuant to NRS 40.2516.

The following summary eviction actions currently being adjudicated by a court may proceed, effective August 31, 2020 at 11:59pm:
  (1) Residential summary evictions actions based upon no cause pursuant to NRS 40.251.
  (2) Residential summary eviction actions based upon nonpayment of rent pursuant to NRS 40.253.

SECTION 8:   Section 1 of Directive 008, which stays all lockouts, is hereby amended to authorize landlords of commercial premises to proceed as authorized by NRS 118C.200, effective June 30, 2020 at 11:59pm.

SECTION 9:  Section 1 of Directive 008, which prohibits a commercial landlord from issuing a notice to vacate, notice to pay or quit, or initiating eviction proceedings, or a commercial lender from commencing foreclosure proceedings is hereby amended as follows:

(1) All summary eviction notices to pay or quit pursuant to NRS 40.2542 served prior to March 30, 2020, in which a tenant has not filed an answering affidavit, are deemed stale and void. All summary eviction notices to pay or quit pursuant to NRS 40.2542 that were served from March 30, 2020 to the effective date of this Directive in violation of Directive 008 are deemed void. To ensure reasonable notice and an opportunity to respond, all stale and/or void notices to vacate must be re-served in accordance with NRS 40.280.

(2) Landlords of commercial premises may initiate or reinitiate summary eviction notices to pay or quit pursuant to NRS 40.2542, effective June 30, 2020 at 11:59pm.

(3) Landlords of commercial premises may initiate unlawful detainer actions pursuant to NRS 40.290-40.420, inclusive, effective June 30, 2020 at 11:59pm.

(4) Commercial lenders may commence foreclosure proceedings effective June 30, 2020 at 11:59pm.

SECTION 10: Section 3 of Directive 008, which prohibits commercial landlords or lenders from charging any late fees or penalties for any nonpayment under the terms of a lease or rental agreement or mortgage, is hereby terminated effective June 30, 2020 at 11:59pm for prospective late rental payments only. This shall not be retroactively applied to late rental payments from March 30, 2020 to June 30, 2020.

SECTION 11: Section 5 of Directive 008, which stayed commercial eviction actions or commercial foreclosure actions currently being adjudicated by a court is hereby amended to allow the court to proceed with a summary eviction hearing, order to show cause hearing seeking a temporary writ of restitution, or unlawful detainer trial, as applicable, under the following timeline. "Actions currently being adjudicated by a court" is intended to include all commercial summary evictions actions in which the tenant has filed an answering affidavit and all commercial unlawful detainer actions brought pursuant to NRS 40.290 to 40.420, inclusive, in which a complaint was filed prior to March 30, 2020.

(1) Commercial summary eviction actions currently being adjudicated by a court based upon nonpayment of rent pursuant to NRS 40.2542 may proceed, effective June 30, 2020 at 11:59pm.

(2) Commercial unlawful detainer actions currently being adjudicated by a court may proceed, effective June 30, 2020 at 11:59pm.

(3) Commercial foreclosure actions current being adjudicated by a court may proceed effective June 30, 2020 at 11:59pm.

SECTION 12: Section 1 of Directive 008, is hereby amended to authorize unlawful detainer actions for other than commercial tenancies, as follows:

For all unlawful detainer actions brought pursuant to NRS 40.290 to 40.420, inclusive, in which the complaint was not filed prior to March 30, 2020, previously served notices to vacate or terminate lease agreements are deemed stale and void. All notices to vacate or terminate lease agreements served between March 30, 2020 and the effective date of this Directive in violation of Directive 008 shall be deemed void. To ensure reasonable notice and an opportunity to respond, all stale and/or void notices must be re-served in accordance with NRS 40.280.

The following unlawful detainer actions may be initiated or re-initiated with new service, effective June 30, 2020 at 11:59pm:

    (1) Unlawful detainer actions seeking termination of a rental or lease agreement for a manufactured home lot in a manufactured home park based on grounds set forth in NRS 118B.200(1)(b)-(g).

    (2) Unlawful detainer actions for possession pursuant to NRS 40.255(1)-(4).

The following unlawful detainer actions may be initiated or re-initiated with new service, effective July 31, 2020 at 11:59pm:

    (1) Unlawful detainer actions seeking termination of a rental or lease agreement for a manufactured home lot in a manufactured home park based on grounds set forth in NRS 118B.200(1)(a).

    (2) Unlawful detainer actions seeking possession of the premises or damages pursuant to NRS 40.250, NRS 40.251(1)(a)(3), NRS 40.2514 and NRS 40.2516.

**SECTION 13:** Section 3 of Directive 008, which prohibits manufactured home park landlords from charging any late fees or penalties for any nonpayment under the terms of a lease or rental agreement, will terminate on July 31, 2020 at 11:59pm for prospective late rental payments only.  This must not be retroactively applied to late rental payments from March 30, 2020 to July 31, 2020.

**SECTION 14:** Section 5 of Directive 008, which stays unlawful detainer actions for other than commercial tenancies currently being adjudicated by a court is hereby amended to allow the court to proceed with an order to show cause hearing seeking a temporary writ of restitution or unlawful detainer trial, as applicable, under the following timeline. "Actions currently being adjudicated by a court" is intended to include all unlawful detainer actions brought pursuant to NRS 40.290 to 40.420, inclusive, in which a complaint was filed prior to March 30, 2020.

The following unlawful detainer actions currently being adjudicated by a court may proceed, effective June 30, 2020 at 11:59pm:

    (1) Unlawful detainer actions for possession pursuant to NRS 40.255(1)-(4).

    (2) Unlawful detainer actions seeking termination of a rental or lease agreement for a manufactured home lot in a manufactured home park based on grounds set forth in NRS 118B.200(1)(b)-(g).

The following unlawful detainer actions currently being adjudicated by a court may proceed, effective July 31, 2020 at 11:59pm:

    (1) Unlawful detainer actions seeking termination of a rental or lease agreement for a manufactured home lot in a manufactured home park based on grounds set forth in NRS 118B.200(1)(a).

    (2) Unlawful detainer actions seeking possession of the premises or damages pursuant to NRS 40.250, NRS 40.251(1)(a)(3), NRS 40.2514 and NRS 40.2516.

**SECTION 15:** Section 1 of Directive 008, which prohibits lockouts, is hereby further amended to terminate any moratorium on actions authorized by places of public accommodations pursuant to Chapter 651 of the Nevada Revised Statutes, effective the date this Directive is signed.  An owner or keeper of any hotel, inn, motel, motor court, boardinghouse or lodging house and their occupants are also strongly encouraged to enter into a repayment agreement for defaults in payments related to COVID-19. Negotiated payment amounts should be made in good faith, be reasonable under the totality of the circumstances, and consider the occupant's ability to pay.

SECTION 16: Should any section of this Directive, or Directive 008 conflict with any provision of the CARES Act, the provisions CARES Act shall prevail.

SECTION 17: A violation of Directive 008 or the provisions of this Directive constitute the use of coercion, duress, or intimidation in a transaction pursuant to NRS 598.0923(4).

SECTION 18: This Directive and Directive 008, except as modified by Sections 5-15, shall remain in effect until August 31, 2020 at 11:59pm, at which time this Directive and all remaining provisions of Directive 008 shall terminate.



IN WITNESS WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Nevada to be affixed at the State Capitol in Carson City, this 25th day of June, in the year two thousand twenty.

_____
Governor of the State of Nevada

_____
Secretary of State

_____
Deputy Secretary of State



## DECLARATION OF EMERGENCY

### DIRECTIVE 031

**WHEREAS,** in late 2019, the United States Centers for Disease Control and Prevention began monitoring an outbreak of respiratory illness caused by a novel coronavirus first identified in Wuhan, Hubei Province, China; and

**WHEREAS,** on February 11, 2020, the International Committee on Taxonomy of Viruses named this novel coronavirus "severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2);" and

**WHEREAS,** on February 11, 2020, the World Health Organization named the disease caused by SARS-CoV-2, "COVID-19;" and

**WHEREAS,** the World Health Organization advises that the novel coronavirus that causes COVID-19 virus is highly contagious, and spreads through respiratory transmission, and direct and indirect contact with infected persons and surfaces; and

**WHEREAS,** the World Health Organization advises that transmission occurs through both droplet and airborne transmission, where droplet transmission occurs when a person is in close proximity to someone who is infected with COVID-19; and

**WHEREAS,** the World Health Organization advises that contact transmission occurs by direct contact with infected people or indirect contact with surfaces contaminated by the novel coronavirus; and

**WHEREAS,** on March 5, 2020, Clark County and Washoe County both reported the first known cases of COVID-19 in the State of Nevada; and

**WHEREAS,** on March 11, 2020, the World Health Organization declared COVID-19 a pandemic; and

**WHEREAS,** on March 12, 2020, I, Steve Sisolak, Governor of the State of Nevada issued a Declaration of Emergency to facilitate the State's response to the COVID-19 pandemic; and

*WHEREAS*, on March 13, 2020, Donald J. Trump, President of the United States declared a nationwide emergency pursuant to Sec. 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"); and

WHEREAS, on March 14, 2020, I formed a medical advisory team to provide medical guidance and scientifically based recommendations on measures Nevada could implement to better contain and mitigate the spread of COVID-19; and

*WHEREAS*, infectious disease and public health experts advised that minimizing interpersonal contact slows the rate at which the disease spreads, and is necessary to avoid overwhelming healthcare systems, commonly referred to as "flattening the curve"; and

*WHEREAS*, since the March 12, 2020 Declaration of Emergency, I have issued 30 Directives pursuant to that order to provide for the safety, wellbeing, and public health of Nevadans and the administration of the State of Nevada; and

*WHEREAS*, these Directives were promulgated to reduce interpersonal contact and promote social distancing to flatten the curve; and

*WHEREAS*, many tenants in Nevada have been directly or indirectly impacted by the economic impact of the COVID-19 pandemic, and as a result, those tenants and lenders have been unable to stay current on rental or mortgage payments for their homes and/or businesses; and

*WHEREAS*, many landlords have been directly or indirectly impacted by the economic fallout of the COVID-19 pandemic, and as a result, those landlords have been unable to collect rental or mortgage payments on residential and commercial properties; and

*WHEREAS*, on March 29, 2020, I issued Directive 008, to ensure the safety of Nevadans and businesses; and

*WHEREAS*, on June 25, 2020, I issued Directive 025 which initiated a phased approach to lifting the restrictions provided in Directive 025; and

*WHEREAS*, on August 7, 2020, I signed SB1 of the 32nd Special Session of the Nevada Legislature into law; and

*WHEREAS*, SB1 provides that Nevada courts could establish by rule an expedited program of alternate dispute resolution concerning evictions; and

*WHEREAS*, SB1 provides that eviction proceedings pursuant to that Act may be stayed for not more than 30 days to facilitate the implementation of the alternative resolution dispute program; and

*WHEREAS*, NRS 2.160 provides that the Supreme Court may promulgate rules that go into effect no sooner than 60 days after entry of an order adopting such rules; and

*WHEREAS*, provisions of Directive 008 and Directive 025 are set to expire on August 31, 2020 at 11:59 p.m., prior to the implementation of SB1; and

**WHEREAS**, on August 27, 2020, the Federal Housing Finance Agency (FHFA) announced that Fannie Mae and Freddie Mac will extend the moratoriums on single-family foreclosures and real estate owned evictions until at least December 31, 2020; and

**WHEREAS**, FHFA Director Mark Calabria said the extension of the moratorium was "to help keep borrowers in their homes during the pandemic"; and

**WHEREAS**, as of August 31, 2020, 69,228 Nevadans have been infected with the COVID-19 disease; and

**WHEREAS**, as of August 31, 2020, 1,305 Nevadans have died from the COVID-19 disease; and

**WHEREAS**, as of August 31, 2020, Nevada is still above the World Heath Organization daily positivity infection rate of 5.0% with a 9.1% daily positivity rate for COVID-19; and

**WHEREAS**, the resumption of eviction proceedings prior to the implementation of an alternative resolution dispute program pursuant to SB1 is anathema to the wishes of the Nevada Legislature; and

**WHEREAS,** as of August 31, 2020, Nevada courts require in-person filing and participation for eviction proceedings; and

**WHEREAS,** a sudden influx of persons in Nevada's courts will increase opportunities for transmission of the novel coronavirus that causes COVID-19; and

**WHEREAS**, Nevada's Chief Medical Officer and public health experts advise against large indoor gatherings where social distancing may not be feasible; including justice courts where crowds may gather if the volume of eviction cases increases significantly and there are no effective means for tenants to electronically file and participate in a court hearing; and

**WHEREAS**, the Chief Medical Officer and public health experts advise that individuals who are experiencing homelessness have an increased vulnerability to COVID-19 exposure and have less access to adequate medical care; and

**WHEREAS,** as of August 31, 2020, there is no cure or vaccine for the COVID-19 disease; and

**WHEREAS,** NRS 414.060 outlines powers and duties delegated to the Governor during the existence of a state of emergency, including without limitation, directing and controlling the conduct of the general public and the movement and cessation of movement of pedestrians and vehicular traffic during, before and after exercises or an emergency or disaster, public meetings or gatherings; and

**WHEREAS**, Article 5, Section 1 of the Nevada Constitution provides: "The supreme executive power of this State, shall be vested in a Chief Magistrate who shall be Governor of the State of Nevada;" and

**NOW THEREFORE,** by the authority vested in me as Governor by the Constitution and the laws of the State of Nevada and the United States, and pursuant to the March 12, 2020, Emergency Declaration,

IT IS HEREBY ORDERED THAT:

SECTION 1:   The provisions of Directive 008 and Directive 025 set to expire on August 31, 2020 at 11:59 p.m. are hereby terminated.  Effective August 31, 2020 at 11:59 p.m. through October 14, 2020 at 11:59 p.m., the initiation of a nonpayment of rent summary eviction action by service of a pay or quit notice pursuant to NRS 40.253 shall be prohibited.

SECTION 2:   A violation of the provisions of this Directive constitutes the use of coercion, duress, or intimidation in a transaction pursuant to NRS 598.0923(4).

SECTION 3:   The Supreme Court of Nevada may exercise its inherent authority as a separate branch of government to waive the provision of NRS 2.120 requiring 60 days between the notice of entry of new rules and its implementation for the purpose of adopting new rules to implement SB1.



IN WITNESS WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Nevada to be affixed at the State Capitol in Carson City, this 31st day of August, in the year two thousand twenty.

_____
Governor of the State of Nevada

_____
Secretary of State

_____
Deputy Secretary of State



### DECLARATION OF EMERGENCY

### DIRECTIVE 036

**WHEREAS,** on March 12, 2020, I, Steve Sisolak, Governor of the State of Nevada, issued a Declaration of Emergency to facilitate the State's response to the COVID-19 pandemic; and

**WHEREAS,** on March 13, 2020, Donald J. Trump, President of the United States, declared a nationwide emergency pursuant to Sec. 501(6) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"); and

**WHEREAS,** the World Health Organization advises that the novel coronavirus that causes COVID-19 virus is highly contagious, and spreads through respiratory transmission, and direct and indirect contact with infected persons and surfaces; and

**WHEREAS,** the World Health Organization advises that transmission occurs through both droplet and airborne transmission, where droplet transmission occurs when a person is in close proximity to someone who is infected with COVID-19; and

**WHEREAS,** the World Health Organization advises that contact transmission occurs by direct contact with infected people or indirect contact with surfaces contaminated by the novel coronavirus; and

**WHEREAS,** close proximity to other persons is currently contraindicated by public health and medical best practices to combat COVID-19; and

**WHEREAS,** efforts to treat, prevent, or reduce the spread of COVID-19 may make it medically necessary and reasonable to require individuals to remain in isolation or quarantine at their places of residence; and

**WHEREAS,** on March 14, 2020, I formed a COVID-19 Medical Advisory Team to provide medical guidance and scientifically based recommendations on measures Nevada could implement to better contain and mitigate the spread of COVID-19; and

**WHEREAS,** the United States Centers for Disease Control and Prevention ("CDC") of the United States Department of Health and Human Services ("DHS") has determined that "[i]n the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to

prevent the spread of communicable disease."   Federal Register Document Number 2020-19654 ("CDC Eviction Order"), 85 FR 55292-55297 at 55294; and

*WHEREAS,* the CDC has further stated that "[e]viction moratoria facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID-19 due to an underlying medical condition. They also allow State and local authorities to more easily implement stay-at-home and social distancing directives to mitigate the community spread of COVID-19. Furthermore, housing stability helps protect public health because homelessness increases the likelihood of individuals moving into close quarters in congregate settings, such as homeless shelters, which then puts individuals at higher risk to COVID-19." CDC Eviction Order at 85 FR 55294; and

*WHEREAS,* on March 18, 2020, the United States Department of Housing and Urban Development ("HUD"), in an effort to provide immediate relief to renters and homeowners, temporarily suspended all foreclosures and evictions for all FHA-insured Single-Family mortgages for an initial period of 60 days; and

*WHEREAS,* the suspension of foreclosures and evictions for all FHA-insured Single-Family mortgages was further extended by HUD on May 14, 2020, June 17, 2020, and August 27, 2020 (https://www.hud.gov/program_offices/administration/hudclips/letters/mortgagee); and

*WHEREAS,* on March 25, 2020, the United States Congress passed an aid-package ("the CARES Act," https://www.congress.gov/116/bills/hr748/BILLS-116hr748enr.pdf), that is intended to provide substantial economic assistance to businesses, individuals, and families throughout the nation, and a temporary suspension of eviction and foreclosure actions or proceedings will give Nevadans and businesses facing financial hardship resulting from the COVID-19 pandemic a grace period to obtain financial assistance made available through this extensive aid-package, as well as others, while allowing them to maintain essential stability in housing and business establishments; and

*WHEREAS,* to avoid serious health, safety, welfare, and financial consequences that may result from the eviction of Nevadans from their places of residence during this emergency, it has been reasonable and necessary to suspend unlawful detainer actions related to residential real property in Nevada; and

*WHEREAS,* on March 29, 2020, I issued Directive 008, to ensure the safety of Nevadans and businesses by temporarily halting eviction proceedings except for those stemming from threats to public health, public safety, criminal activity, or significant damage to property; and

*WHEREAS,* on June 25, 2020, I issued Directive 025, which amended Directive 008 to provide a phased approach to lifting the prohibitions contained within Directive 008, with full resumption of eviction proceedings to commence on September 1, 2020; and

*WHEREAS,* on August 31, 2020, I issued Directive 031, which terminated Directives 008 and 025 and delayed full resumption of evictions based upon service of the initiation of a nonpayment of rent summary eviction action by service of a pay or quit notice pursuant to NRS 40.253 until October 15, 2020; and

*WHEREAS,* on September 4, 2020, the CDC national order staying execution of nonpayment of rent eviction judgments against tenants meeting certain criteria for nonpayment of rent for eligible tenants went into effect (Federal Register Document Number 2020-19654 https://www.federalregister.gov/documents/2020/09/04/2020-19654/temporary-halt-in-residential-evictions-to-prevent-the-further-spread-of-covid-19; https://www.cdc.gov/coronavirus/2019-ncov/covid-eviction-declaration.html); and

**WHEREAS**, on October 15, 2020, all Nevada prohibitions against eviction proceedings expired while the CDC's Eviction Order remained in effect; and

**WHEREAS**, the State of Nevada and some of its political subdivisions utilized CARES Act funding to create COVID-19 rental assistance programs; and

**WHEREAS**, Senate Bill 1 ("SB1") of the 32nd Special Session of the Nevada Legislature authorized the Supreme Court of Nevada to develop and implement an expedited program of alternative dispute resolution for eviction proceedings; and

**WHEREAS**, on July 31, 2020, during legislative testimony on SB1, testimony was offered that, according to the State Treasurer's Office, the State could experience approximately 135,000 evictions. Similarly, a Guinn Center Report presented during the hearing projected that approximately 142,000 households may be affected by evictions. (Senate Daily Journal of the Thirty-second Special Session, 2020 at p. 26, available at https://www.leg.state.nv.us/App/NELIS/REL/32nd2020Special/Bill/7139/Meetings); and

**WHEREAS**, pursuant to SB1, the Supreme Court of Nevada adopted rules ADKT 562, ADKT 564, ADKT 566, and ADKT 567 related to mediation of residential summary evictions, which became effective on October 15, 2020 (http://caseinfo.nvsupremecourt.us/document/view.do?csNameID=59751&csIID=59751&deLinkID=784829&onBaseDocumentNumber=20-32070); and

**WHEREAS**, on March 29, 2020 when Directive 008 was issued, Nevada's 14-Day COVID-19 Test Positivity rate was 11.2%, there were 558 confirmed or suspected COVID-19 cases hospitalized, and 142 cases in the ICU, statewide; and

**WHEREAS**, on June 25, 2020 when Directive 025 was issued, Nevada's 14-Day COVID-19 Test Positivity rate was 9.5%, there were 471 confirmed or suspected COVID-19 cases hospitalized, and 118 cases in the ICU, statewide; and

**WHEREAS**, on September 4, 2020, when the CDC Eviction Order went into effect, the United States of America saw 49,686 new cases, with a 7-day moving average of 41,893 cases (https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases); and

**WHEREAS**, on October 15, 2020, when all State of Nevada eviction moratoria expired, Nevada's 14-Day Test Positivity Rate had fallen to 8.8%, there were 469 confirmed or suspected COVID-19 cases hospitalized, and 142 cases in the ICU, statewide; and

**WHEREAS**, as of December 11, 2020, 291,522 Americans, including 2,479 Nevadans have died from COVID-19 and its complications (https://covid.cdc.gov/covid-data-tracker/#trends_totalandratedeaths; https://nvhealthresponse.nv.gov/); and

**WHEREAS**, as of December 10, 2020, the State of Nevada is experiencing record high levels of COVID-19 infections, with a 14-Day Test Positivity Rate of 21.9%, 1,854 confirmed or suspected COVID-19 cases hospitalized, and 394 cases in the ICU, statewide; and

**WHEREAS**, as of December 12, 2020, the State of Nevada has the highest per-capita COVID-19 hospitalization rate in the nation (https://thenevadaindependent.com/article/coronavirus-contextualized-33rd-edition-nevada-now-1st-in-the-nation-for-most-covid-19-hospitalizations-per-capita); and

---

*WHEREAS,* the CDC Eviction Order is set to expire on December 31, 2020; and

*WHEREAS,* the HUD moratorium on foreclosures and evictions for all FHA-insured Single-Family mortgages is currently sent to expire on December 31, 2020; and

*WHEREAS,* the public health considerations that precipitated CDC Order are more calamitous than on September 4, 2020 when the Order went into effect, with 203,229 new cases per day in the United States of America, and a 7-Day moving average of 204,766 cases (https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases) – almost five times as many cases – as of December 11, 2020; and

*WHEREAS,* many Nevadans have been and continue to be directly or indirectly impacted by the economic impact of the COVID-19 pandemic, and as a result, have been unable to stay current on rental payments for their places of residence; and

*WHEREAS,* federal programs to aid recovery from the pandemic including funding from the CARES Act designated by the State of Nevada for rental assistance programs are set to revert to the federal government on or about December 31, 2020; and

*WHEREAS,* the Congress of the United States has been negotiating additional pandemic relief bills for several months (*see, e.g.,* https://www.reuters.com/article/idUSL1N2F526G); and

*WHEREAS,* there has been a widespread call for Congress to include an eviction moratorium and rent relief in any pandemic relief bill (*see, e.g.,* https://www.americanbar.org/news/abanews/aba-news-archives/2020/09/aba-asks-congress-for-eviction-moratorium/); and

*WHEREAS,* as of December 12, 2020, Congress has failed to pass any additional legislation affording relief to Americans in distress; and

*WHEREAS,* there is a need for immediate action in Nevada to avoid eviction harms and uncertainty for all actors within the rental market should Congress continue to fail to act; and

*WHEREAS,* Nevada's rental assistance programs for residential tenants have not fully disbursed all available funds; and

*WHEREAS,* on December 11, 2020, the COVID-19 Medical Advisory Team convened to consider the impact the resumption of evictions would have on Nevada's COVID-19 infection rate; and

*WHEREAS,* the COVID-19 Medical Advisory Team noted the "Administrator for Housing Commission stated latest figures show NV range of households at risk of eviction is 74,000-147,000," and if the "CDC order lifted would be an additional 25,700-51,300. . ." (Minutes of December 11, 2020 COVID-19 Medical Advisory Team meeting, hereinafter referenced as "MAT Minutes"); and

*WHEREAS,* the COVID-19 Medical Advisory Team experts stated that "[h]ousing is public health issue. Homeless shelters are packed, not conducive to halting or slowing virus transmission," and "significant evidence shows spikes in housing eviction would only contribute to additional risk and spread of the virus within the community. . ." (MAT Minutes at 3); and

---

*WHEREAS,* the COVID-19 Medical Advisory Team experts additionally stated, "[i]f the question is [whether] evictions lead to increase transmission or not, than *[sic]* answer is clear, they do" (MAT Minutes at 3); and

*WHEREAS,* the COVID-19 Medical Advisory Team unanimously recommended that I issue "an executive order to enact a moratorium on evictions to address the COVID-19 public health emergency and reduce increased community transmission caused by displacement and homelessness in Nevada. . ." (Governor's COVID-19 Medical Advisory Team Recommendation Summary (December 11th, 2020)); and

*WHEREAS,* as of December 12, 2020, the Los Alamos National Laboratory COVID-19 Six-Week Forecast for Nevada predicts that if State of Nevada takes no additional measures, by January 1, 2021, Nevada will experience approximately 293,000 COVID-19 cases and 3,600 deaths (https://covid-19.bsvgateway.org/); and

*WHEREAS,* as of December 13, 2020, 85% of all licensed hospital beds and 74% of all adult Intensive Care Unit ("ICU") beds in the State of Nevada were occupied; and

*WHEREAS,* based on the advice of the experts on the COVID-19 Medical Advisory Team and guidance from the Centers for Disease Control, the State of Nevada has an urgent imperative to temporarily limit evictions to lower the COVID-19 infection rate; and

*WHEREAS,* the State of Nevada has a compelling public interest in protecting the health and safety of its residents by reducing the COVID-19 infection rate to save lives and avoid exceeding the capacity of our healthcare system; and

*WHEREAS,* NRS 414.060 outlines powers and duties delegated to the Governor during the existence of a state of emergency, including without limitation, directing and controlling the conduct of the general public and the movement and cessation of movement of pedestrians and vehicular traffic during, before and after exercises or an emergency or disaster, public meetings or gatherings; and

*WHEREAS,* NRS 414.070 outlines additional powers delegated to the Governor during the existence of a state of emergency, including without limitation, enforcing all laws and regulations relating to emergency management and assuming direct operational control of any or all forces, including, without limitation, volunteers and auxiliary staff for emergency management in the State; providing for and compelling the evacuation of all or part of the population from any stricken or threatened area or areas within the State and to take such steps as are necessary for the receipt and care of those persons; and performing and exercising such other functions, powers and duties as are necessary to promote and secure the safety and protection of the civilian population; and

*WHEREAS,* the Nevada Attorney General opined in Opinion Number 57-336 that "[t]here can be no question but that the Legislature intended to give to the Governor the broadest possible powers consistent with constitutional government in a time of dire emergency"; and

*WHEREAS,* Article 5, Section 1 of the Nevada Constitution provides: "The supreme executive power of this State, shall be vested in a Chief Magistrate who shall be Governor of the State of Nevada;"

*NOW THEREFORE,* by the authority vested in me as Governor by the Constitution and the laws of the State of Nevada and the United States, and pursuant to the March 12, 2020 Emergency Declaration,

IT IS HEREBY ORDERED THAT:

SECTION 1:  For the purposes of this Directive, "Landlord" shall be defined as set forth in NRS 118A.100 and NRS 118B.014. The term shall additionally encompass property managers, or other agents acting on behalf of the Landlord.

SECTION 2:  For the purposes of this Directive, a "Covered Person" is a tenant as defined by NRS 118A.170 or NRS 118B.0185, who:
   (1) .Is unable, due to circumstances related to the COVID-19 pandemic, to pay the full rent due to substantial loss of household income, significant loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses;
   (2) Is likely to become homeless or be forced to move into a congregate or shared living situation if evicted; and
   (3) The individual:
      a. Expects to earn no more than $99,000 in annual income for Calendar Year 2020 (or no more than $198,000 if filing a joint tax return);
      b. Was not required to report any income in 2019 to the U.S. Internal Revenue Service; or
      c. Received an Economic Impact Payment (stimulus check) pursuant to Section 2201 of the CARES Act.

SECTION 3:  Except as otherwise provided for in this Directive, effective 12:01 a.m. on December 15, 2020, through the duration this Directive shall be in effect, the following residential unlawful detainer or summary eviction actions ("Covered Evictions") against Covered Persons are stayed:
   (1) Actions based on continued possession after the termination of the lease agreement pursuant to the contractual terms of the lease agreement and for which the tenant is in default on rent;
   (2) Actions pursuant to NRS 40.251, other than NRS 40.251(1)(a)(3), NRS 40.251(1)(b)(2), NRS 40.251(1)(c)(1), NRS 40.251(1)(d), and NRS 40.250, through summary eviction pursuant to NRS 40.254 and for which the tenant is in default on rent;
   (3) Actions based upon nonpayment of rent pursuant to NRS 40.2512, NRS 118B.200(1)(a), and NRS 40.290 to NRS 40.420 inclusive; or
   (4) Actions through summary eviction based upon nonpayment of rent pursuant to NRS 40.253.

SECTION 4:  A tenant who satisfies the eligibility criteria set forth in Section 2 may seek the protections of this Directive by providing the landlord with an affidavit or a declaration swearing under penalty of perjury that the tenant meets each of the criteria set forth in Section 2, ("Covered Person Declaration"). This provision may also be satisfied by CDC declarations previously provided to a landlord.

Except as otherwise provided in Section 5 and Section 6, upon receipt of a Covered Person Declaration, no lockout, notice to vacate, notice to pay or quit, eviction, or other proceeding related to a Covered Eviction action may be initiated against the tenant.

Actions related to a Covered Eviction that are currently pending in a court shall be stayed until after the expiration of this Directive if the tenant presents to the court, or the evidence shows that the tenant previously presented to the landlord, a Covered Person Declaration. In such cases, the landlord may apply for an exception from this stay pursuant to Section 5 or Section 6 of this Directive.

SECTION 5:   A landlord may challenge the tenant's eligibility by providing notice required for the Covered Eviction pursuant to NRS 40.280, along with a notice to the tenant that the landlord is challenging the tenant's Covered Person Declaration.

The tenant may establish or re-establish eligibility to be a Covered Person by presenting any evidence supporting his or her eligibility by including it in or attaching it to:
   (1)  A tenant's filed sworn declaration or affidavit contesting the notice of eviction;
   (2)  Testimony at any hearing or appearance in court; or
   (3)  By any other manner authorized by the court.

The landlord when filing a complaint, or if a proceeding is already pending, an appropriate motion or request; must include:
   (1)  A copy of the tenant's Covered Person Declaration; and
   (2)  Evidence which demonstrates that the tenant does not meet one or more of the criteria set forth in Section 2.

A challenge may be deemed frivolous if the landlord files the complaint without a good-faith basis to believe that the tenant does not meet the criteria in Section 2, or files a complaint without supporting evidence.  The court may sanction landlords filing frivolous challenges.

SECTION 6:   A landlord may seek an exemption from this Directive by providing notice required for the Covered Eviction pursuant to NRS 40.280, along with a notice to the tenant that the landlord is seeking an exemption due to risk of foreclosure.

A landlord may request an exemption from the provisions of this Directive by filing with a court of competent jurisdiction:
   (1)  A complaint, or if a proceeding is already pending, an appropriate motion or request; and,
   (2)  Evidence which demonstrates that the landlord faces a realistic threat that the leased property will be foreclosed upon before the expiration of this Directive, unless the landlord is able to evict the tenant.

If the court finds that the landlord has demonstrated a realistic threat that the leased property will be foreclosed upon before the expiration of this Directive, the action is exempt from the provisions of this Directive.

SECTION 7:   Execution of eviction orders not covered by Section 3 of this Directive that have been issued by a court and stayed pursuant to the CDC Order may resume upon expiration of the CDC Order.  All eviction orders within the purview of Section 3 shall be stayed for the duration this Directive shall be in force.  Prior to resumption of execution of these orders upon the expiration of the CDC Order, the sheriff or constable must re-post the order prior to conducting the lock out.

SECTION 8:   Eviction orders that have been issued by a court and have not been stayed pursuant to the CDC Order due to the lack of evidence that the tenant invoked protection of the CDC Order, are exempt from the provisions of this Directive.

SECTION 9:   In addition to any other civil remedies in NRS chapter 40 and NRS chapter 118A, a violation of the provisions of this Directive constitutes the use of coercion, duress, or intimidation in a transaction pursuant to NRS 598.0923(4).

SECTION 10:  Should any section of this Directive conflict with any provision of the CARES Act or its successor legislation, the provisions of the CARES Act or its successor legislation, shall prevail.

SECTION 11:  No provision of this Directive shall be construed as relieving any individual of any contractual obligation to pay rent.  Further, nothing in this Directive waives any applicable late fees, interest, or penalties, or any other obligation that an individual may have pursuant to a lease or rental agreement for any applicable time period it had not already been waived by any prior Directive.

SECTION 12:  The provisions of this Directive shall be severable.  If any clause, provision, section, sentence, or other portion of this Directive is found to be inapplicable, invalid, void, unconstitutional, or unlawful, such invalidation shall not affect any other provision of this Directive that can be given effect without the invalid portion.

SECTION 13:  The provisions of this Directive shall go into effect on December 15, 2020 at 12:01 a.m. and shall remain in effect until March 31, 2021 at 11:59 p.m., unless sooner amended or terminated by a subsequent Directive promulgated pursuant to the March 12, 2020 Declaration of Emergency to facilitate the State's response to the COVID-19 pandemic, or upon dissolution or termination of the Declaration of Emergency.



IN WITNESS WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Nevada to be affixed this 14th day of December, in the year two thousand twenty.

_____
Governor of the State of Nevada

_____
Secretary of State

_____
Deputy Secretary of State



### DECLARATION OF EMERGENCY

### DIRECTIVE 043

**WHEREAS**, on March 12, 2020, I, Steve Sisolak, Governor of the State of Nevada, issued a Declaration of Emergency to facilitate the State's response to the COVID-19 pandemic; and

**WHEREAS**, on March 13, 2020, Donald J. Trump, President of the United States, declared a nationwide emergency pursuant to Sec. 501(6) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"); and

**WHEREAS**, the World Health Organization advises that the novel coronavirus that causes COVID-19 virus is highly contagious, and spreads through respiratory transmission, and direct and indirect contact with infected persons and surfaces; and

**WHEREAS**, the World Health Organization advises that transmission occurs through both droplet and airborne transmission, where droplet transmission occurs when a person is in close proximity to someone who is infected with COVID-19; and

**WHEREAS**, the World Health Organization advises that contact transmission occurs by direct contact with infected people or indirect contact with surfaces contaminated by the novel coronavirus; and

**WHEREAS**, close proximity to other persons is currently contraindicated by public health and medical best practices to combat COVID-19; and

**WHEREAS**, efforts to treat, prevent, or reduce the spread of COVID-19 may make it medically necessary and reasonable to require individuals to remain in isolation or quarantine at their places of residence; and

**WHEREAS**, on March 14, 2020, I formed a COVID-19 Medical Advisory Team to provide medical guidance and scientifically based recommendations on measures Nevada could implement to better contain and mitigate the spread of COVID-19; and

**WHEREAS**, the United States Centers for Disease Control and Prevention ("CDC") of the United States Department of Health and Human Services ("DHS") has determined that "[i]n the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to

---

1

prevent the spread of communicable disease." Federal Register Document Number 2020-19654 ("CDC Eviction Order"), 85 FR 55292-55297 at 55294; and

*WHEREAS*, the CDC has further stated that "[e]viction moratoria facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID-19 due to an underlying medical condition. They also allow State and local authorities to more easily implement stay-at-home and social distancing directives to mitigate the community spread of COVID-19. Furthermore, housing stability helps protect public health because homelessness increases the likelihood of individuals moving into close quarters in congregate settings, such as homeless shelters, which then puts individuals at higher risk to COVID-19." CDC Eviction Order at 85 FR 55294.

*WHEREAS*, on March 18, 2020, the United States Department of Housing and Urban Development ("HUD"), in an effort to provide immediate relief to renters and homeowners, temporarily suspended all foreclosures and evictions for all FHA-insured Single-Family mortgages for an initial period of 60 days; and

*WHEREAS*, the suspension of foreclosures and evictions for all FHA-insured Single-Family mortgages was further extended by HUD on May 14, 2020, June 17, 2020, and August 27, 2020 (https://www.hud.gov/program_offices/administration/hudclips/letters/mortgagee); and

*WHEREAS*, on March 25, 2020, the United States Congress passed an aid-package ("the CARES Act," https://www.congress.gov/116/bills/hr748/BILLS-116hr748enr.pdf), that is intended to provide substantial economic assistance to businesses, individuals, and families throughout the nation, and a temporary suspension of eviction and foreclosure actions or proceedings will give Nevadans and businesses facing financial hardship resulting from the COVID-19 pandemic a grace period to obtain financial assistance made available through this extensive aid-package, as well as others, while allowing them to maintain essential stability in housing and business establishments; and

*WHEREAS*, to avoid serious health, safety, welfare, and financial consequences that may result from the eviction of Nevadans from their places of residence during this emergency, it has been reasonable and necessary to suspend unlawful detainer actions related to residential real property in Nevada; and

*WHEREAS*, on March 29, 2020, I issued Directive 008, to ensure the safety of Nevadans and businesses by temporarily halting eviction proceedings except for those stemming from threats to public health, public safety, criminal activity, or significant damage to property; and

*WHEREAS*, on June 25, 2020, I issued Directive 025, which amended Directive 008 to provide a phased approach to lifting the prohibitions contained within Directive 008, with full resumption of eviction proceedings to commence on September 1, 2020; and

*WHEREAS*, on August 31, 2020, I issued Directive 031, which terminated Directives 008 and 025 and delayed full resumption of evictions based upon service of the initiation of a nonpayment of rent summary eviction action by service of a pay or quit notice pursuant to NRS 40.253 until October 15, 2020; and

*WHEREAS*, on September 4, 2020, the CDC national order staying execution of nonpayment of rent eviction judgments against tenants meeting certain criteria for nonpayment of rent for eligible tenants went into effect (Federal Register Document Number 2020-19654 https://www.federalregister.gov/documents/2020/09/04/2020-19654/temporary-halt-in-residential-evictions-to-prevent-the-further-spread-of-covid-19; https://www.cdc.gov/coronavirus/2019-ncov/covid-eviction-declaration.html); and

**WHEREAS**, on October 15, 2020, all Nevada prohibitions against eviction proceedings expired while the CDC's Eviction Order remained in effect; and

**WHEREAS**, the State of Nevada and some of its political subdivisions utilized CARES Act funding to create COVID-19 rental assistance programs; and

**WHEREAS**, Senate Bill 1 ("SB1") of the 32nd Special Session of the Nevada Legislature authorized the Supreme Court of Nevada to develop and implement an expedited program of alternative dispute resolution for eviction proceedings; and

**WHEREAS**, on July 31, 2020, during legislative testimony on SB1, testimony was offered that, according to the State Treasurer's Office, the State could experience approximately 135,000 evictions. Similarly, a Guinn Center Report presented during the hearing projected that approximately 142,000 households may be affected by evictions. (Senate Daily Journal of the Thirty-second Special Session, 2020 at p. 26, available at https://www.leg.state.nv.us/App/NELIS/REL/32nd2020Special/Bill/7139/Meetings); and

**WHEREAS**, pursuant to SB1, the Supreme Court of Nevada adopted rules ADKT 562, ADKT 564, ADKT 566, and ADKT 567 related to mediation of residential summary evictions, which became effective on October 15, 2020 (http://caseinfo.nvsupremecourt.us/document/view.do?csNameID=59751&csIID=59751&delAnkID=784829&onBaseDocumentNumber=20-32070); and

**WHEREAS**, on December 14, 2020, I issued Directive 036, which extended the State prohibition on certain evictions for certain persons until March 31, 2021; and

**WHEREAS**, on March 29, 2021, the CDC Eviction Order was extended to expire on June 30, 2021; and

**WHEREAS**, the HUD moratorium on foreclosures and evictions for all FHA-insured Single-Family mortgages was extended to expire on June 30, 2021; and

**WHEREAS**, as of March 26, 2021, Nevada has one of the highest unemployment rates in the nation, at 8.3%; and

**WHEREAS**, the public health considerations that precipitated CDC Order and Directive 036 remain a serious threat to public safety; and

**WHEREAS**, many Nevadans have been and continue to be directly or indirectly impacted by the economic impact of the COVID-19 pandemic, and as a result, have been unable to stay current on rental payments for their places of residence; and

**WHEREAS**, on December 11, 2020, the COVID-19 Medical Advisory Team convened to consider the impact the resumption of evictions would have on Nevada's COVID-19 infection rate; and

**WHEREAS**, the COVID-19 Medical Advisory Team noted the "Administrator for Housing Commission stated latest figures show NV range of households at risk of eviction is 74,000-147,000," and if the "CDC order lifted would be an additional 25,700-51,300. . ." (Minutes of December 11, 2020 COVID-19 Medical Advisory Team meeting, hereinafter referenced as "MAT Minutes"); and

*WHEREAS,* the COVID 19 Medical Advisory Team experts stated that "[h]ousing is public health issue. Homeless shelters are packed, not conducive to halting or slowing virus transmission," and "significant evidence shows spikes in housing eviction would only contribute to additional risk and spread of the virus within the community. ..." (MAT Minutes at 3); and

*WHEREAS,* the COVID-19 Medical Advisory Team experts additionally stated, "[i]f the question is [whether] evictions lead to increase transmission or not, than *[sic]* answer is clear, they do" (MAT Minutes at 3); and

*WHEREAS,* the COVID-19 Medical Advisory Team unanimously recommended that I issue "an executive order to enact a moratorium on evictions to address the COVID-19 public health emergency and reduce increased community transmission caused by displacement and homelessness in Nevada. . ." (Governor's COVID-19 Medical Advisory Team Recommendation Summary (December 11th, 2020)); and

*WHEREAS,* the Congress of the United States has recently passed the American Rescue Plan Act of 2021 ("ARP Act"), which was signed into law on March 11, 2021 by President Joseph R. Biden, to provide additional pandemic relief to individuals and to states, including appropriations for rent relief; and

*WHEREAS,* there is a need for immediate action in Nevada to avoid eviction harms and uncertainty for all actors within the rental market; and

*WHEREAS,* Nevada's rental assistance programs for residential tenants and landlords have not fully disbursed all available funds and additional funding for those programs will be provided by the ARP Act; and

*WHEREAS,* based on the advice of the experts on the COVID-19 Medical Advisory Team and guidance from the Centers for Disease Control, the State of Nevada has an urgent imperative to temporarily limit evictions to lower the COVID-19 infection rate; and

*WHEREAS,* the State of Nevada has a compelling public interest in protecting the health and safety of its residents by reducing the COVID-19 infection rate to save lives and avoid exceeding the capacity of our healthcare system; and

*WHEREAS,* NRS 414.060 outlines powers and duties delegated to the Governor during the existence of a state of emergency, including without limitation, directing and controlling the conduct of the general public and the movement and cessation of movement of pedestrians and vehicular traffic during, before and after exercises or an emergency or disaster, public meetings or gatherings; and

*WHEREAS*, Article 5, Section 1 of the Nevada Constitution provides: "The supreme executive power of this State, shall be vested in a Chief Magistrate who shall be Governor of the State of Nevada;"

*NOW THEREFORE,* by the authority vested in me as Governor by the Constitution and the laws of the State of Nevada and the United States, and pursuant to the March 12, 2020 Emergency Declaration,

IT IS HEREBY ORDERED THAT:

SECTION 1:   The provisions of previous Directives are hereby superseded only by the explicit provisions of this Directive. Any provisions not addressed by this Directive shall remain in force as provided by previous Directives or regulations promulgated pursuant to the March 12, 2020 Declaration of Emergency.

SECTION 2:   Section 2 of Directive 036 is hereby amended to read as follows:

For the purposes of this Directive, a "Covered Person" is a tenant as defined by NRS 118A.170 or NRS 118B.0185, who:

1. Is unable, due to circumstances related to the COVID-19 pandemic, to pay the full rent due to substantial loss of household income, significant loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses;
2. Is likely to become homeless or be forced to move into a congregate or shared living situation if evicted; and
3. The individual:
   a. Earned no more than $99,000 in annual income for Calendar Year 2020 or expects to earn no more than $99,000 in Calendar Year 2021 (or no more than $198,000 if filing a joint tax return);
   b. Was not required to report any income in 2019 or 2020 to the U.S. Internal Revenue Service; or
   c. Received an Economic Impact Payment (stimulus check) pursuant to Section 2201 of the CARES Act or a Recovery Rebate (stimulus check) pursuant to Section 9601 of the ARP Act.

SECTION 3:   For purposes of this Directive, the term "Covered Eviction" has the meaning ascribed to it in Section 3 of Directive 036.

SECTION 4:   In addition to the provisions in Directive 036, if a landlord serves a notice pursuant to NRS 40.280, a notice to vacate, notice to quit or pay, or any other notice to a tenant related to removal of the tenant or surrender of the premises related to a Covered Eviction, the landlord must include with the notice an informational statement ("Informational Statement") on a form prescribed by the Nevada Housing Division of the Department of Business & Industry. The Informational Statement must include the following:

- A statement that the eviction moratoria pursuant to the CDC Order and the State's emergency directives provide protection from eviction to certain persons in certain residential evictions;
- A statement that the protections of the moratoria are not automatic, and that the tenant must respond to the notice and must take action in order to avoid eviction, unless the tenant has already provided a Covered Person Declaration or CDC declaration to his or her landlord;
- A description of who is a Covered Person, as defined in Directive 036;
- A statement that a tenant who qualifies as a Covered Person has the option to present a Covered Person Declaration, and a copy of a Covered Person Declaration form; and
- Information regarding rental assistance programs in the tenant's county and information on how to access such programs.

The Informational Statement must be printed in at least size 12 font, provided in a clear and conspicuous manner, and must be printed and provided in both English and Spanish.

SECTION 5:   A tenant who has already provided a Covered Person Declaration or a CDC declaration to his or her landlord pursuant to Directive 036 or the CDC Order is not required to provide a new declaration in order to be protected under this Directive.

SECTION 6:   Section 4 of Directive 036 is hereby amended to add the following:

This Section does not stay eviction mediation proceedings pursuant to the program established by the Nevada Supreme Court for cases that were pending in a court prior to the effective date of this Directive. This Section does not stay or prohibit any process or application for rental relief or assistance.

SECTION 7:   Should any section of this Directive conflict with any provision of the CARES Act, the ARP Act, or any successor legislation, the provisions of the CARES Act, ARP Act, or successor legislation, shall prevail.

SECTION 8:   The provisions of this Directive shall be severable.  If any clause, provision, section, sentence, or other portion of this Directive is found to be inapplicable, invalid, void, unconstitutional, or unlawful, such invalidation shall not affect any other provision of this Directive that can be given effect without the invalid portion.

SECTION 9:   Section 13 of Directive 036 is hereby amended to strike "March 31, 2021" and replace it with "May 31, 2021."

SECTION 10: The provisions of this Directive shall remain in effect until May 31, 2021 at 11:59 p.m., unless sooner amended or terminated by a subsequent Directive promulgated pursuant to the March 12, 2020 Declaration of Emergency to facilitate the State's response to the COVID-19 pandemic, or upon dissolution or termination of the Declaration of Emergency.



IN WITNESS WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Nevada to be affixed this 31st day of March, in the year two thousand twenty-one.

_____
Governor of the State of Nevada

_____
Secretary of State

_____
Deputy Secretary of State

6